# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA ) 
*ex rel.* SCOTT PERME, )
                     )
           Plaintiffs,          ) Case No.: 3:21-cv-25-SMY *SEALED*
v.                            ) **FILED UNDER SEAL**
                     ) Pursuant to 31 U.S.C. § 3730
BIOSCRIP, INC., APPLIED HEALTH CARE, LLC, )
BIOSCRIP INFUSION MANAGEMENT, LLC, )
BIOSCRIP INFUSION SERVICES, INC., ) (False Claims Act)
BIOSCRIP INFUSION SERVICES, LLC, )
BIOSRIP MEDICAL SUPPLY SERVICES, LLC, )
BIOSCRIP NURSING SERVICES, LLC, )
BIOSCRIP PBM SERVICES, LLC, )
BIOSCRIP PHARMACY (NY), INC., )
BIOSCRIP PHARMACY SERVICES, INC., )
BIOSCRIP PHARMACY, INC., )
BIOSCRIP PHARMACY PUERTO RICO, INC., )
BRADHURST SPECIALTY PHARMACY, INC., )
CHRONIMED, LLC, CHS HOLDINGS, INC., )
CRITICAL HOMECARE SOLUTIONS, INC., )
DEACONESS ENTERPRISES, LLC, )
DEACONESS HOMECARE, LLC, )
EAST GOSHEN PHARMACY, INC., )
HOMECHOICE PARTNERS, INC., )
INFUSAL PARTNERS, INFUSCIENCE HHA, LLC, )
INFUSCIENCE, INC., )
INFUSCIENCE SOUTH CAROLINA, LLC, )
INFUSCIENCE SUB, INC., )
INFUSION PARTNERS OF BRUNSWICK, LLC, )
INFUSION PARTNERS OF MELBOURNE, LLC, )
INFUSION PARTNERS, LLC, )
INFUSION SOLUTIONS, INC., )
INFUSION THERAPY SPECIALISTS, INC., )
KNOXVILLE HOME THERAPIES, LLC, )
NATIONAL HEALTH INFUSION, INC., )
NEW ENGLAND HOME THERAPIES, INC., )
NUTRI USA INC., OPTION HEALTH, LTD., )
PROFESSIONAL HOME CARE SERVICES, INC., )
PHCS ACQUISITION CO., INC., )
REGIONAL AMBULATORY DIAGNOSTICS, INC., )
SCOTT-WILSON, INC., SPECIALTY PHARMA, INC., )
WILCOX MEDICAL, INC., )
OPTION CARE HEALTH INC., F/K/A BIOSCRIP, INC., )
and HC GROUP HOLDINGS II, LLC, )
                     )
          Defendants.        )

## SEALED COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff and *qui tam* Relator, Scott Perme, by and through counsel, Seidman Margulis & Fairman, LLP, and Monico & Spevack, and brings this False Claims Act ("FCA") Complaint on behalf of the United States of America for damages and civil penalties arising out of the violations of the Federal False Claims Act, 31 U.S.C. §§ 3729-3733 by Defendants, BioScrip, Inc., Applied Health Care, LLC, BioScrip Infusion Management, LLC, BioScrip Infusion Services, Inc., BioScrip Infusion Services, LLC, BioSrip Medical Supply Services, LLC, BioScrip Nursing Services, LLC, BioScrip PBM Services, LLC, BioScrip Pharmacy (NY), Inc., BioScrip Pharmacy Services, Inc., BioScrip Pharmacy, Inc., BioScrip Pharmacy Puerto Rico, Inc., Bradhurst Specialty Pharmacy, Inc., Chronimed, LLC, CHS Holdings, Inc., Critical Homecare Solutions, Inc., Deaconess enterprises, LLC, Deaconess HomeCare, LLC, East Goshen Pharmacy, Inc., HomeChoice Partners, Inc., Infusal Partners, InfuScience HHA, LLC, InfuScience, Inc., InfuScience South Carolina, LLC, InfuScience Sub, Inc., Infusion Partners of Brunswick, LLC, Infusion Partners of Melbourne, LLC, Infusion Partners, LLC, Infusion Solutions, Inc., Infusion Therapy Specialists, Inc., Knoxville Home Therapies, LLC, National Health Infusion, Inc., New England Home Therapies, Inc., Nutri USA Inc., Option Health, Ltd., Professional Home Care Services, Inc., PHCS Acquisition Co., Inc., Regional Ambulatory Diagnostics, Inc., Scott-Wilson, Inc., Specialty Pharma, Inc., Wilcox Medical, Inc., Option Care Health Inc., f/k/a BioScrip, Inc., and HC Group Holdings II, LLC, and in support thereof, states the following:

## I.   <u>INTRODUCTION</u>

1.      Qui Tam Relator Scott Perme, (hereinafter "Relator"), brings this action on his own behalf and on behalf of the United States of America to recover civil damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq*.

2.      This is an action to recover damages and penalties on behalf of the United States of America, due to false and fraudulent records, statements, and claims made, used, and caused to be

made, used, and presented by Defendants BioScrip, Inc., Applied Health Care, LLC, BioScrip Infusion Management, LLC, BioScrip Infusion Services, Inc., BioScrip Infusion Services, LLC, BioSrip Medical Supply Services, LLC, BioScrip Nursing Services, LLC, BioScrip PBM Services, LLC, BioScrip Pharmacy (NY), Inc., BioScrip Pharmacy Services, Inc., BioScrip Pharmacy, Inc., BioScrip Pharmacy Puerto Rico, Inc., Bradhurst Specialty Pharmacy, Inc., Chronimed, LLC, CHS Holdings, Inc., Critical Homecare Solutions, Inc., Deaconess enterprises, LLC, Deaconess HomeCare, LLC, East Goshen Pharmacy, Inc., HomeChoice Partners, Inc., Infusal Partners, InfuScience HHA, LLC, InfuScience, Inc., InfuScience South Carolina, LLC, InfuScience Sub, Inc., Infusion Partners of Brunswick, LLC, Infusion Partners of Melbourne, LLC, Infusion Partners, LLC, Infusion Solutions, Inc., Infusion Therapy Specialists, Inc., Knoxville Home Therapies, LLC, National Health Infusion, Inc., New England Home Therapies, Inc., Nutri USA Inc., Option Health, Ltd., Professional Home Care Services, Inc., PHCS Acquisition Co., Inc., Regional Ambulatory Diagnostics, Inc., Scott-Wilson, Inc., Specialty Pharma, Inc., Wilcox Medical, Inc., Option Care Health Inc., f/k/a BioScrip, Inc., and HC Group Holdings II, LLC *(hereinafter collectively "BioScrip")*, and/or their respective agents, employees, predecessors, and co-consiprators, in violation of the federal Anti-Kickback Statute, 42 U.S.C. § 1320-7b(b), and the federal False Claims Act, 31 U.S.C. § 3729, *et seq.*

3.     BioScrip has been engaging in systematic fraudulent schemes, arising from their sale of expensive drugs, including infusion drugs.

4.     In particular, BioScrip knowingly and unlawfully induced Medicare beneficiaries to utilize, and reward them for utilizing, BioScrip's pharmaceutical products. BioScrip effectuated this scheme by providing kickbacks to patients through routine waiver of mandated cost-sharing copayment obligations – often in amounts exceeding several thousand dollars per beneficiary – without regard to authenticated financial need, and without good-faith attempts to collect the copayments.

5.     BioScrip additionally falsely and fraudulently billed treatment to Medicare Part B,

instead of billing correctly to Medicare Part D, which served to falsely and fraudulently reduce and waive the beneficiaries' copays.

6.     In addition, BioScrip routinely shipped pharmaceuticals without completing required conditions precedent, such as required pre-authorizations, resulting in Medicare paying for drugs which it otherwise would not have paid for had it been aware that the required conditions precedent had not been met.

## II.     PARTIES

7.     Prior to August 2019, Defendant, BioScrip, Inc., was a for-profit corporation incorporated under the laws of the state of Delaware and headquartered in the state of Colorado.

8.     Subsequent to a merger that occurred on or about August 2019, the entity formerly known as BioScrip, Inc. began operations as Option Care Health, Inc., a for-profit a corporation incorporated under the laws of the state of Delaware and headquartered in the state of Illinois.

9.     HC Group Holdings II, LLC, is and was a parent company that, upon information and belief, during the aforementioned merger purchased BioScrip, Inc., and its subsidiaries, along with the liability of BioScrip, Inc., and its subsidiaries.

10.    Prior to August 2019, Applied Health Care, LLC, BioScrip Infusion Management, LLC, BioScrip Infusion Services, Inc., BioScrip Infusion Services, LLC, BioSrip Medical Supply Services, LLC, BioScrip Nursing Services, LLC, BioScrip PBM Services, LLC, BioScrip Pharmacy (NY), Inc., BioScrip Pharmacy Services, Inc., BioScrip Pharmacy, Inc., BioScrip Pharmacy Puerto Rico, Inc., Bradhurst Specialty Pharmacy, Inc., Chronimed, LLC, CHS Holdings, Inc., Critical Homecare Solutions, Inc., Deaconess enterprises, LLC, Deaconess HomeCare, LLC, East Goshen Pharmacy, Inc., HomeChoice Partners, Inc., Infusal Partners, InfuScience HHA, LLC, InfuScience, Inc., InfuScience South Carolina, LLC, InfuScience Sub, Inc., Infusion Partners of Brunswick, LLC, Infusion Partners of Melbourne, LLC, Infusion Partners, LLC, Infusion Solutions, Inc., Infusion Therapy Specialists, Inc.,

Knoxville Home Therapies, LLC, National Health Infusion, Inc., New England Home Therapies, Inc., Nutri USA Inc., Option Health, Ltd., Professional Home Care Services, Inc., PHCS Acquisition Co., Inc., Regional Ambulatory Diagnostics, Inc., Scott-Wilson, Inc., Specialty Pharma, Inc., and Wilcox Medical, Inc., *(hereinafter collectively "BioScrip Subsidiaries")*, were subsidiaries of BioScrip, Inc., and subsequent to the August 2019 merger are now subsidiaries of Option Care Health, Inc., f/k/a BioScrip, Inc.

11.     The BioScrip Subsidiaries are organized under the laws of, and operate in, many different states across the country, including Illinois.

12.     At all relevant times, BioScrip is a large national pharmaceutical company, and the self-proclaimed largest national provider of infusion pharmaceutical products.

13.     Prior to 2019, BioScrip competed with a related group of corporations known collectively as "Option Care." In August 2019, BioScrip and OptionCare merged. Subsequently, the various BioScrip subsidiaries have done business

14.     As part of the merger between BioScrip and OptionCare, in August 2019, HC Group Holdings II, Inc. purchased BioScrip. Thereafter, BioScrip, Inc. began operations as Option Care Health, Inc., f/k/a BioScrip, Inc.

15.     BioScrip, is, and at all relevant times stated herein has done business in the Southern District of Illinois.

16.     BioScrip operates an infusion therapy center in Belleville, Illinois.

17.     Relator is a citizen of Illinois and resident of the United States of America.

18.     Relator is an original source of the information contained within this Complaint within the meaning of 31 U.S.C. 3730 (e)(4)(B), but further states that to his knowledge the information contained herein concerning Defendants' alleged False Claims Act violations has not been publicly disclosed.

19.     Relator is a certified pharmacy technician who has spent the majority of the last twenty years in management roles in the pharmaceutical supplies industry. Beginning in 2000, and for more than a decade, Relator operated his own pharmacy, and was responsible among other duties for all of the pharmacy's accounting, with average yearly sales of $3.9 million.

20.     After other roles in the pharmaceuticals industry, from February 2019 through September 2020, Relator was employed by Option Care-related entities. There he worked as a manager responsible for purchasing, warehousing, inventory, equipment, and logistics. This role included, among other things, overseeing the inventory of specialty pharmaceuticals and the purchasing of related supplies, overseeing the processing, validating, and reconciliation of all inventory data, and management of the equipment of 1,500 infusion pumps, including preventative maintenance.

21.     Relator's allegations against Defendants relate to Medicare fraud, that Defendants knowingly presented, and caused to be presented, false and fraudulent claims for payment to Medicare.

### III.     JURISDICTION AND VENUE

22.     This action arises under the laws of the United States to redress violations of the federal FCA, 31 U.S.C. § 3729 *et seq.*

23.     Subject-matter jurisdiction is conferred by 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331.

24.     This Court has personal jurisdiction over this matter pursuant to 31 U.S.C. § 3732(a), as BioScrip and/or one or more of the BioScrip defendants, transacts business and/or performed acts proscribed by 31 U.S.C. § 3729 in the Southern District of Illinois.

25.     Venue lies under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) because Defendants transact business within this district, and the acts complained of herein took place, in part, in this District.

26.     In accordance with 31 U.S.C. § 3730(b)(2), this Complaint has been filed under seal and will remain under seal for a period of at least sixty (60) days and shall not be served on the Defendant

until the Court so orders.

27.     Pursuant to 31 U.S.C. § 3730(b)(2), Relator has served copies of this Complaint upon the United States Attorney for the Southern District of Illinois, as well as the Attorney General of the Untied States of America.

28.     The facts and circumstances of the Defendants' violations of the FCA have not been publicly disclosed in a criminal, civil, or administrative hearing, nor in any congressional, administrative, or General Accounting Office or Auditor General's report, hearing, audit, or investigation, or in the news media.

29.     Relator is the original source of the information upon which this Complaint is based, within the meaning of the False claims Act, 31 U.S.C. § 3730(e)(4)(B), and Relator provided disclosures of the allegations of this Complaint to the United States prior to filing the present action.

### IV.     STATUTORY AND REGULATORY FRAMEWORK

### FEDERAL FALSE CLAIMS ACT AND ANTI-KICKBACK STATUTE

30.     The False Claims Act provides that any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval, or who knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim to the Government is liable for damages in the amount of three (3) times the amount of loss the Government sustained and penalties which range between $,5,500 and $11,000 per claim.  31 U.S.C. § 3728(a); 28 C.F.R. § 85.3.  For the purposes of the FCA, "the terms 'knowing' and 'knowingly' mean that a person, . . . (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information."  Id.  "[N]o proof of specific intent to defraud is required" for a successful claim under the FCA.  Id. 31 U.S.C. § 3729(b).

31.     The federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2)(B) ("AKS"), prohibits

offering to pay or paying any remuneration "to any person to induce such person to purchase . . . any good. . . service, or item for which payment may be made in whole or in part under a Federal healthcare program.

32.     Compliance with the AKS is expressly and impliedly required for reimbursement of federal program claims, and claims made in violation of the AKS are actionable civilly under the False Claims Act. *See* 42 U.S.C. § 1320a-7(b)(g) (2010) (a "claim that includes items or services resulting from a violation of . . . [the AKS] constitutes a false or fraudulent claim for purposes of [the False Claims Act]. . . ."). Thus, An AKS violation that results in a federal health care payment is a per se false claim under the False Claims Act.

33.     A person or entity does not need the actual knowledge of a violation, or specific intent to commit  violation, in order to violate the AKS's anti-kickback provisions. Pub. L. No. 111-148, 124 STAT. 759 § 6402.

34.     Where reimbursement for medical care is tainted by illegal kickbacks, the entire claim for reimbursement is "false" within the meaning of the FCA. Compliance with the AKS is required for payment by Medicare.

## MEDICARE

35.     Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.* establishes the Health Insurance for the Aged and Disabled Program, known as Medicare.  Medicare is a federally operated and funded program, administered by the Secretary of Health and Human Services ("HHS") through the Centers for Medicare and Medicaid Services ("CMS"), a department of HHS.

36.     Medicare Part B is a federally subsidized, voluntary insurance program covering a percentage of the fee schedule amount of physician and laboratory services.  42 U.S.C. §§ 1395(k),(l),(x).

37.     In 2003, Congress passed the Medicare Prescription Drug Benefit, Improvement and

Modernization Act, which established Medicare Part D, a voluntary prescription drug coverage benefit for eligible individuals. *See* 42 U.S.C. §§ 1395w-101 *et seq.*; 42 C.F.R. Part 423.

38.     Medicare beneficiaries entitled to Medicare benefits under Medicare Part A or Part B are eligible for prescription drug benefits under Part D. Drugs covered under the Part A or Part B benefit are not covered under Part D. 42 U.S.C. § 1396w-102(e)(2)(B). Notwithstanding the creation of the Part D benefit, certain prescription drugs remain covered under Medicare under B.

39.     Unlike coverage in Medicare Parts A and B, Part D coverage is not provided through the traditional Medicare program; instead, benefits are provided through private entities, known as "Plan Sponsors," who establish Part D benefit plans, with features that vary depending on certain factors. *See* 42 U.S.C. § 1395w-132; 42 C.F.R. § 423.4.

40.     In order to obtain coverage under Part D, eligible Medicare beneficiaries must affirmatively elect enrollment in one of the hundreds of Part D plans offered by Plan Sponsors.

41.     Plan Sponsors are required to submit the features of each Part D plan to CMS, which makes public the features of the plans, including the amount of applicable copayments. 42 C.F.R. §§ 423.502, 423.265 and 423.272.

42.     In order to qualify for Part D payments from CMS, each approved Plan Sponsor must submit, before each annual plan year, a certified bid for each offered plan. 42 C.F.R. § 423.265. The bid contains a monthly cost estimate for providing Part D benefits to an average Medicare beneficiary in a particular geographic area. Based upon the cost estimates, CMS calculates average regional and national cost estimates. 42 C.F.R. § 423.272(a)(2).

43.     During each year, on a monthly basis, CMS pays the Plan Sponsor estimated payments comprised of the Sponsor's direct premium subsidy per enrolled, estimated reinsurance subsidies for catastrophic coverage, and estimated low-income subsidies. 42 C.F.R. §§ 423.315, 423.320.

44.     Plan Sponsors notify CMS throughout the plan year each time a Medicare beneficiary

has a prescription filled under Part D. Claims are submitted to CMS through a Prescription Drug Event ("PDE") record for every prescription that is filled for a plan member. By providing this drug cost and payment data for each filled prescription, the Plan Sponsor informs CMS of the actual prescription drug costs.

45.     At the end of the plan year, if CMS has underpaid the sponsor for low-income subsidies or reinsurance costs, CMS makes up the difference. If CMS overpaid the sponsor for these costs, it recoups the overpayment from the Part D sponsor. 42 C.F.R. § 423.343.

46.     After CMS reconciles a plan's low-income subsidy and reinsurance costs, it then determines risk-sharing amounts owed by the plan to CMS or by CMS to the plan related to the plan's direct subsidy bid. Risk-sharing amounts involve calculations based on whether and to what degree a plan's allowable costs per beneficiary exceeded or fell below a target amount for the plan by certain threshold percentages (commonly called the Part D "risk corridor"). 42 U.S.C. § 1395w-115(e); 42 C.F.R. § 423.336.

47.     Medicare requires that Part D Plan Sponsors agree to comply with the requirements and standards of Part D and all terms and conditions of payment. 42 U.S.C. § 1395w-112(b)(l); 42 C.F.R. § 423.505(i)(4)(iv). These terms include compliance with "[f]ederal laws and regulations designed to prevent fraud, waste and abuse, including ... the False Claims Act ... and the anti-kickback statute . . . ." 42 C.F.R. § 423.505(h)(l).

48.     Further, the contract between the Part D Plan Sponsor and CMS must include those terms set forth in 42 C.F.R. § 423.505(b), including compliance with certain reporting requirements *(see§* 423.514) and claims submission *(see§* 423.505(b)(8) and (9)).

49.     Compliance with regulatory requirements is similarly required of "downstream entities," typically those entities that maintain a contract with the Part D Sponsor to provide the ultimate health care service rendered to the enrollee. *See Medicare Prescription Drug Benefit Manual,* ch. 9, § 40.

Under CMS regulations, Sponsors' subcontracts with pharmacies must contain language obligating the pharmacy to comply with all applicable federal laws, regulations, and CMS instructions. 42 C.F.R. §§ 423.505(i)(3)(v) and 423.505(i)(4)(iv).

50.     When a specialty pharmacy receives a prescription from a physician, the pharmacy confirms Part D coverage and plan details for the beneficiary, and dispenses the prescribed drugs to or for the benefit of the Medicare Part D beneficiary. The pharmacy then submits an electronic claim to the beneficiary's Part D Plan Sponsor (either directly or through a subcontracted intermediary). This electronic claim includes the cost of the drug, a dispensing fee, and any sales or similar taxes paid, less any payments received from the enrollee. As a condition of payment, sponsors, in turn, must submit data and information necessary for CMS to effectuate Part D's payment provisions; this data includes the claims information provided by the specialty pharmacy to the Plan Sponsor for use in submitting PDE's to CMS. 42 C.F.R. § 1395w-115(c)(l)(C), (d)(2); 42 C.F.R. § 423.322.

51.     The pharmacy then receives payment from the Plan Sponsor for the costs not paid by the beneficiary. The pharmacy is responsible for collecting any cost-sharing portion from the Part D beneficiary,

52.     The Part D Plan Sponsor, in tum, notifies CMS that a drug has been purchased and dispensed, by completing a Prescription Drug Event ("PDE") record, which details the amount paid to the pharmacy. As a condition of payment, the information must be certified to CMS by the Sponsor as accurate, complete and truthful. 42 C.F.R. § 423.505(k)(l). In making this certification to CMS, the Sponsor relies upon the accuracy and integrity of the underlying claim information. 42 C.F.R. § 423.505(k)(3). CMS utilizes the information in the PDE at the end of the payment year to reconcile actual sponsor costs with advanced payments that have been made to the sponsor by CMS. *See United States ex rel. Spay v. CVS Caremark,* 913 F. Supp. 2d 125, 150 (E.D. Pa. 2012). These requirements are plainly summarized in CMS' *Medicare Prescription Drug Benefit Manual,* ch. 9, § 80.1:

53.     When submitting claims data to CMS for payment, Sponsors and their subcontractors must certify that the claims data is true and accurate to the best of their knowledge and belief. The False Claims Act is enforced against any individual/entity that knowingly submits (or causes another individual/entity to submit) a false claim for payment to the Federal government. *Id.* (emphasis added).

### COPAYMENTS

54.     Federally funded health care programs utilize beneficiary cost-sharing measures that impose financial responsibility on the beneficiary for certain costs related to the services utilized. For prescription drugs covered under Part B, the beneficiary is typically responsible for 20% of the Medicare-approved amount, as well as the applicable Part B deductible. States have the option to establish out of pocket spending requirements for prescription drugs, which may include copayments, coinsurance, deductibles and other similar charges paid by the Medicaid enrollee.

55.     Although the specific features may vary depending on the particular plan, Part D drug plans provide coverage in phases, with the amount of enrollee cost-sharing varying greatly depending on the phases of coverage. Coverage phases are determine by the amount of "true out-of-pocket" ("TrOOP") expenditures the enrollee has incurred on prescription medication during the calendar year.

56.     Once an eligible enrollee selects a Part D plan, the enrollee begins paying monthly premiums to the Plan Sponsor, in accordance with the terms of the particular plan. When an enrollee obtains a prescription from a physician, the enrollee has the prescription filled by a pharmacy. The pharmacy confirms Part D coverage for the enrollee, as well as the amount of enrollee financial responsibility for the prescription.

57.     Beyond the monthly premium, Part D coverage requires that beneficiaries maintain financial responsibility (also known as "cost-sharing") for: a.) an annual deductible; b.) a percentage-based copayment for actual costs above the annual deductible but at or below an initial coverage limit ("initial benefit"); c.) a higher percentage of an amount above the deductible plus the copayment (this

feature of Part D plans is commonly referred to as the "coverage gap" or "donut hole"); and d.) a percentage of catastrophic coverage ("Catastrophic Coverage") costs for the remainder of a coverage year once an enrollee's costs exceed the annual out-of-pocket threshold. *See Medicare Prescription Drug Benefit Manual,* ch. 5, § 20.3.

58.     Medicare additionally provides "Extra Help" benefit to pay prescription drug costs for those who meet specific income and resource limits. This benefit helps defray the cost of the monthly Part D premium, as well as other Part D out-of-pocket costs.

59.     The correct calculation of TrOOP expenditures is an essential component of Part D plan administration and CMS has issued significant guidance on the TrOOP methodology, emphasizing the importance of accurate TrOOP reporting. *See, e.g., Medicare Prescription Drug Benefit Manual,* ch. 5, § 30. As with other aspects of the Part D program, responsibility accurate reporting of TrOOP data to CMS falls upon the Part D Sponsor and downstream entities, including pharmacies. Indeed, PDE's specifically require the reporting of patient payments, listing the dollar amount paid by the Part D beneficiary.

60.     Further, CMS has specifically identified inaccurate TrOOP calculation as an example of potential fraud, waste and abuse in the Medicare Part D program. *Medicare Prescription Drug Benefit Manual,* ch. 9, § 70.1.

61.     As with other aspects of the Part D program, responsibility accurate reporting of TrOOP data to CMS falls upon the Part D Sponsor and downstream entities, including pharmacies. Indeed, PDE's specifically require the reporting of patient payments, listing the dollar amount paid by the Part D beneficiary.

62.     Further, CMS has specifically identified inaccurate TrOOP calculation as an example of potential fraud, waste and abuse in the Medicare Part D program. *Medicare Prescription Drug Benefit Manual,* ch. 9, § 70.1.

63.     It is well established that routine waivers of patient cost-sharing amounts, without regard to authenticated financial need, may constitute illegal remuneration under the Anti-Kickback Statute. In 1994, the HHS Office of Inspector General issued a "Special Fraud Alert" regarding the unlawful practice of routinely waiving cost-sharing amounts to be paid by Medicare beneficiaries, because such practices can result in illegal inducements to beneficiaries and overutilization of healthcare items and services, in violation of the AKS. 59 Fed. Red. 65373, 65374 (Dec. 19, 1994); *see* 42 U.S.C. § 1320a-7b(b).

64.     In identifying common patterns of fraudulent conduct, the OIG specifically listed indicators of improper copayment waivers, including the routine use of financial hardship forms where there is "no good faith attempt to determine the beneficiary's actual financial condition[;]" "Collection of copayments . . . only where the beneficiary has Medicare supplemental insurance . . . coverage[;]" and the "[f]ailure to collect copayments . . . for a specific group of Medicare patients for reasons unrelated to indigency[.]" 59 Fed. Red. 65373, 65374 (Dec. 19, 1994).

65.     Thus, the Special Fraud Alert specifically includes the failure to collect copayments within the umbrella of improper copayment waiver.

66.     The Special Fraud Alert gives the following example regarding copayment waivers: "if a supplier claims that its charge for a piece of equipment is $100, but routinely waives the copayment, the actual charge is $80. Medicare should be paying 80 percent of $80 (or $64), rather than 80% of $100 (or $80). As a result of the supplier's misrepresentation, the Medicare program is paying $16 more than it should for this item." *Id.*

67.     With respect to copay waiver exception for financial hardship, the OIG fraud alert cautions that the financial hardship exception should not be used routinely, but only occasionally to address "the special financial needs of a particular patient. Except in such special cases, a good faith effort to collect . . . copayments must be made." *Id.*

14

68.     The fraud alert further states that inducing patients to purchase items or services from the provider by waiving copays violates the Medicare and Medicaid Anti-Kickback Statute ("AKS"), 42 U.S.C. 1320(a)-7b(b).

69.     The routine waiver of copays violates the AKS by offering an inducement to generate business payable by Medicare. *Id.* AKS violations constitute *per se* false or fraudulent claims. *Id.*, 1320a-7b(g).

70.     The same principles embodied in the Special Fraud Alert have been applied in fashioning narrow statutory safe harbors that only permit waiver of cost-sharing obligations in extremely narrow circumstances, deemed to alleviate concerns of fraudulent inducements. Specifically, with regard to Medicare Part D programs, pharmacies may receive safe harbor protection under the AKS for waivers of cost-sharing amounts, only where the person making the waiver (i) does not offer the waiver as part of any advertisement or solicitation; (ii) does not routinely waive coinsurance or deductible amounts; and (iii) determines in good faith that the recipient of the waiver is in financial need or fails to collect the owed amount after reasonable collection efforts. 42 U .S.C. § l 320a-7b(b)(3)(G).

71.     Similarly, the Medicare Prescription Drug Benefit Manual states that pharmacies may waive Part D cost-sharing amounts only "in an unadvertised, non-routine manner after determining that the beneficiary is financially needy or after failing to collect the cost-sharing amount despite reasonable efforts." *Medicare Prescription Drug Benefit Manual,* ch. 5, § 30.4.

72.     Routine waivers and reductions of cost-sharing amounts are only permitted for those Part D beneficiaries who receive Part D low-income subsidies; yet, even this exception is negated if the pharmacy "advertise[s] in any way the availability of waivers or cost reductions." *Id.*

### V.      PARTY-SPECIFIC FACTUAL ALLEGATIONS

73.     In anticipation of the merger, or more specifically of Option Care's forthcoming

acquisition of BioScrip, beginning in or around March 2019 Option Care staff reviewed BioScrip's accounting.

74.     Option Care staff, including Relator, came to learn that BioScrip had amassed large amounts of open unpaid balances from patients.

75.     Option Care staff, including Relator, further learned that BioScrip had not been making bona fide efforts to collect on these open balances.

76.     Relator learned that BioScrip had not been sending invoices to patients, and patients were not aware that there were outstanding balances for unpaid copayments.

77.     Option Care staff, including Relator, learned that BioScrip had no financial assistance program.

78.     Option Care staff, including Relator, learned that BioScrip was not making any good faith efforts to examine patients' finances and/or financial hardship status in deciding to not collect on balances.

79.     BioScrip's patients with large outstanding balances, whose balances BioScrip had made no good faith effort to collect, and with no financial assistance program or good faith examination of finances, included Medicare beneficiaries.

80.     BioScrip's patients with large outstanding balances, whose balances BioScrip had made no good faith effort to collect, and with no financial assistance program or good faith examination of finances, included Medicare beneficiaries with unpaid Medicare copayments, including Part D copayments.

81.     BioScrip's failure to make good faith attempts to collect Medicare copayments, without good faith examination of finances and/or financial hardship constituted copayment waiver.

82.     As BioScrip was purchased by Option Care and entered the Option Care family of corporations, BioScrip patients were onboarded into the Option Care electronic records system.

16

83.    In examining BioScrip's finances, Option Care staff, including Relator, learned that BioScrip had been billing under Part B treatment that should have been properly billed under Part D.

84.    By billing falsely under Part B, BioScrip patients were billed for less copays, as they were able to avoid the coverage gap of Part D. Further, Part B copayments were often paid by secondary health insurance plans.

85.    Only after BioScrip was purchased by the Option Care family of corporations, BioScrip began to bill patients that had been falsely billed under Part B, under Part D.

86.    Option Care staff, including Relator, learned that many BioScrip patients subsequently threatened and did in fact leave BioScrip/Option Care when they were billed properly under Part D instead of improperly under Part B.

87.    After BioScrip was purchased by the Option Care family of corporations, in an attempt to evaluate whether a co-pay waiver safe harbor could be applied, patients who had been receiving co-pay waivers were asked to provide information relating to financial hardship status in order to examine whether they qualified for a co-pay waiver safe harbor.

88.    Option Care staff, including Relator, learned that many BioScrip patients subsequently threatened and did in fact leave BioScrip/Option Care when they were asked to provide information relating to financial hardship status in order to examine whether they qualified for a co-pay waiver safe harbor.

89.    After BioScrip was purchased by the Option Care family of corporations, patients who had been receiving co-pay waivers were actually sent invoices, billing statements, and/or other information in attempts to collect the open balances from waived co-pays.

90.    Option Care staff, including Relator, learned that many BioScrip patients subsequently threatened and did in fact leave BioScrip/Option Care when they were provided with invoices, billing statements, and/or other information in attempts to collect the open balances from waived co-pays.

17

91.     When Option Care discovered BioScrip's false and fraudulent copayment waivers, BioScrip subsequently began to offer BioScrip patients the option of applying for Option Care's financial hardship program.

92.     Many patients failed to provide sufficient financial information in order for BioScrip to make a good faith examination of the patients' financial status and/or financial hardship; However, BioScrip routinely provided copayment waivers nonetheless.

93.     Option Care staff, including Relator, additionally discovered that BioScrip had been shipping pharmaceutical products billed to Medicare without completing required conditions precedent, including the completion of required prior authorizations.

## V.     COUNTS FOR RELIEF – ALL DEFENDANTS

## FIRST COUNT – ALL DEFENDANTS

### VIOLATIONS OF FALSE CLAIMS ACT – PRESENTING FALSE CLAIMS [31 U.S.C. § 3729(a)(1) (2006), and, as amended, 31 U.S.C. § 3729(a)(1)(a)].

94.     Relator realleges and incorporates by reference all preceding allegations in this Complaint as if specifically reiterated herein.

95.     This is a claim for treble damages and civil penalties under Section 3729(a)(l), and, as amended, 31 U.S.C. § 3729(a)(l)(A), of the False Claims Act, 31 U.S.C. § 3729 *et seq.*

96.     Defendants, each of them, routinely waived patient cost-sharing amounts, without regard to individual circumstances and without *bona fide* authentication of patient financial needs which constitutes remuneration.

97.     This remuneration was knowingly offered and paid to induce and reward the purchase of goods, items and services, paid by federal health care program Medicare, from Defendants, each of them, in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

98.      The actions of Defendants, each of them, were not protected under any safe harbor regulations.

99.     As a prerequisite to participating in federally-funded health care programs, Defendants, each off them, expressly certified, and/or through their participation in a federally funded program, impliedly certified, their compliance with certain applicable statutes and regulations, including the federal Anti-Kickback Statute and other laws pertaining to fraud and abuse in federal healthcare programs.

100.    As a result of the acts set forth above, Defendant knowingly presented, or caused to be presented, false or fraudulent claims to the United States Government for payment or approval, in violation of Title 31, United States Code, Section 3729(a)(l) (2006), and, as amended,§ 3729(a)(l)(A).

101.    The United States, unaware of the false and fraudulent nature of these claims, paid these claims, which otherwise would not have been paid.

102.    By reason of the false or fraudulent claims, the United States has sustained damages, and continues to sustain damages, in a substantial amount.

WHEREFORE, Relator prays for judgment against Defendants, each of them, for three times the amount of damages the United States has sustained because of Defendants' actions, plus the maximum authorized civil penalty for each and every false claim that Defendant caused to be presented to the United States, the maximum allowable civil penalties for each violation of the Anti-Kickback Statute as well as an assessment of three times the amount of remuneration offered, paid, solicited, or received, and an order awarding Relator the maximum amount allowed as a "Relator's Share" pursuant to 31 U.S.C. 3730(d) of the federal False Claims Act, all reasonable expenses, plus reasonable attorneys' fees and costs, and any other relief as this Court may deem equitable and just.

## SECOND COUNT – ALL DEFENDANTS

**VIOLATIONS OF FALSE CLAIMS ACT – USE OF FALSE STATEMENTS [31 U.S.C. § 3729(a)(1) (2006), and, as amended, 31 U.S.C. § 3729(a)(1)(a)].**

103.    Relator re-alleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

104.    This is a claim for treble damages and civil penalties under Section 3729(a)(2)(2006), and, as amended, 31 U.S.C. § 3729(a)(l)(B), of the False Claims Act, 31 U.S.C. § 3729 *et seq.*

105.    Defendants, each of them, knowingly made and used false records or statements, material to a false or fraudulent claim, by falsely representing the collection of patient cost-sharing amounts.

106.    As a result of the acts set forth above, Defendants, each of them, made and used, and caused others to make and use, false records or statements that were material to false or fraudulent claims for payment submitted to federal health care programs. The false records or statements included claims submitted to Medicare, Part D Sponsors, Prescription Drug Event records, calculations of TrOOP spending amounts, and false certifications and representations of compliance with federal laws and regulations, including the federal Anti-Kickback Statute and federal False Claims Act.

107.    As a result of the acts set forth above, Defendant knowingly presented, or caused to be presented, false or fraudulent claims to the United States Government for payment or approval, in violation of Title 31, United States Code, Section 3729(a)(l) (2006), and, as amended,§ 3729(a)(l)(A).

108.    The United States, unaware of the false and fraudulent nature of these claims, paid these claims, which otherwise would not have been paid.

109.    By reason of the false or fraudulent claims, the United States has sustained damages, and continues to sustain damages, in a substantial amount.

WHEREFORE, Relator prays for judgment against Defendants, each of them, for three times the amount of damages the United States has sustained because of Defendants' actions, plus the maximum authorized civil penalty for each and every false claim that Defendant caused to be presented to the United States, the maximum allowable civil penalties for each violation of the Anti-Kickback Statute as well as an assessment of three times the amount of remuneration offered, paid, solicited, or received, and an order awarding Relator the maximum amount allowed as a "Relator's Share" pursuant

20

to 31 U.S.C. 3730(d) of the federal False Claims Act, all reasonable expenses, plus reasonable

attorneys' fees and costs, and any other relief as this Court may deem equitable and just.

## JURY TRIAL DEMAND

Relator demands trial by jury on all issues so triable.


Respectfully Submitted,


SEIDMAN MARGULIS & FAIRMAN, LLP


/s/ Daniel R. Seidman
Attorneys for Relator

Daniel R. Seidman (#6308142)
SEIDMAN MARGULIS & FAIRMAN, LLP
10805 Sunset Office Dr., Ste. 300
Sunset Hills, MO 63127
(314) 238-1342
F: (224) 603-8345
dseidman@seidmanaw.net

Steven J. Seidman (#6181388)
SEIDMAN MARGULIS & FAIRMAN, LLP
20 S. Clark St., Ste. 700
Chicago, IL 60603
(312) 781-1977
F: (312) 853-2187
sseidman@seidmanlaw.net

Barry A. Spevack (#3122754)
MONICO & SPEVACK
53 W. Jackson Blvd. Ste. 1315
Chicago, IL 60604
(312) 782-8500
bspevack@monicolaw.com